May I personally keep the flower there? May I also please show the podium? Is there a visit to the house? Good morning, your honor. Good morning, your honors. Kevin Clancy on behalf of Swedish Covenant Hospital. Good afternoon, your honors. Karen DeGrande for Dr. Kamal, an international teleradiologist. How do you explain your... Mr. Clancy is going to take the lead and I will perhaps chime in for a few minutes if there is any issue that has to be clarified specifically at this point. Mr. Clancy, you have who? Swedish Covenant Hospital. Thank you. And you heard the announcement about the microphones. They speak into the microphones but they don't broadcast to the audience so you need to keep your voices up so we can talk. Thank you. May it please the court, your honors, counsel. My name is Harry Quinn and I represent the estate of Xi Quan Bao. This appeal follows from the entry of a summary judgment against the plaintiff on the issue of proximate cause. This is a de novo review giving no deference to the trial court or its rulings where the movement's burden has the burden to show that summary judgment and their right to summary judgment is free and clear from doubt. That is a high standard. And the only question in this case is whether the record contains some evidence that the conduct of either defendant was a cause of injury to Ms. Bao. Not the only cause, not the last or the nearest cause because there is a chronology in this case involving two hospitals. Proximate cause, as we know, is uniquely and classically a question of factual injury. That is especially true in medical malpractice cases. That's because those cases are very complex. They are fact-driven. And almost without exception, they require expert testimony to prove the element including these cases. So here we have separate defendants. I'd like to speak to each since the court entered separate orders. Correct. What was it that the judge did wrong with regard to proximate cause for the two parties that are the defendants? Okay. How would you delineate the error in the court's ways? I would delineate that error as follows. If you read the transcript of the hearings, December 20th as to one defendant and February 1st as to the other defendant, the analysis was exactly the same. And the takeaway is that the court found in each case with respect to each defendant that Ms. Bowe's decision on July 11th when she was called back to Swedish Covenant to get a second opinion, for lack of a better word, up at Lutheran General, as the court stated it, broke the chain of causation for the conduct of Dr. Kamal, who misread the CT scan that did in fact show a brain bleed, as well as Swedish Covenant for the failure to transmit the actual images of that head CT to Lutheran General. What duty did they have to transmit it? I think it's the duty of reasonable care that's applicable to any actor institutionally. Is there expert testimony to that effect? I believe that Dr. Larkin states that that should have been. I believe Dr. Larkin states that that should have been done. But I would point out, we did not get to expert discovery. There were not full disclosures of experts. So it's my understanding that this was done before you got to expert depositions for discovery. And it's also my understanding from reading the experts that there was no oral argument on either of these issues. Was there an oral argument requested? Well, when we appeared for the hearings, the court had indicated that the court was prepared to rule on the briefs, and I think both parties just assented to that. Another important fact question here is that it's my understanding that she was also not given a copy of the CD that she was given when she left the hospital. That is correct. When she left, Swedish, she was not given any records at all. What evidence was there regarding the standard of care on that issue? Well, I would point out that standard of care is not at issue in this case. I think what we have to do is assume. Well, you were dismissed out, so you better address it. As you said, it's been over-reviewed, so in answer to Justice Walker's question, in my question, what duty did Swedish Government have to give her the records, and whether there's any testimony that that was a breach of the standard of care, and did she ask for it? If she ever asked for them, I'm really struggling with the notion that they just pat everything up when a patient, a prospective patient, says, I don't want to be treated here, I want to go to the Lutheran General. So they're supposed to bundle everything up, hand it to her, and say good luck? Well, I think factually, take a step back, it was Swedish Covenant who missed the bleed, which is a dangerous, life-threatening condition. Three hours later, they called her back and said they found the bleed. Or essentially said, you should be admitted, you need to get treatment. Three hours after, they told her she didn't need treatment. I think it was... Our position is that when they call her back and tell her she needs treatment for a dangerous condition, and she chooses to go elsewhere, they have a duty to provide the medical information pertinent to that patient, so that the subsequent... Providing a valid request? True. Now... Wasn't there a request from Lutheran? Lutheran, the emergency room doctor, Dr. Ogark, he did call to Swedish when Ms. Bauer was a patient in the ER. They faxed the... Other than the CT test sheet that Dr. Caramel looked at, was there anything else? It didn't seem to me. Everything else was provided but that CT scan. The images were not provided, but was there anything else that wasn't provided? I don't know that the entire emergency room chart was provided according to Dr. Ogark. You're not complaining about that? I'm not necessarily complaining about that. One thing you're complaining about is that in sending material, and there was testimony from the doctors, even in Lutheran, I feel that sometimes they do get these... Correct. Pictures. Correct. And they did in this case. Because their position is that had they received it, what? Had they received that, a reasonably careful doctor, now with a film that shows a bleed, and a film that doesn't show a bleed, has to err on the side of caution, and admit that patient on the basis of the bleed on the first film. Well, the next question would be, they already knew from the report that a doctor had read it that morning and said there's a bleed. So whether they had the picture or not, why is that the tipping point in this case? Well, I believe on this record that's a matter of dispute as to whether the doctors at Lutheran General actually believed, based on the report and the history, that Ms. Bau was found definitively at Swedish Covenant to have a bleed. Did they both testify? Dr. Kellogg and Bau, I guess? Both. Both. Didn't they both say whether we had the picture or not, we would have done what we did? That was their testimony. And? My response to that is that Illinois law allows a plaintiff not to basically accept that as the final word, understanding that Dr. Bau and Dr. Kellogg are being sued in this case. I understand it. The plaintiff had the ability to present expert testimony to rebut. And what would the expert testimony, or what was it, from Dr. Larson, in regard to what Kellogg and Bowers did? That a reason... But that goes to their language. Well, it goes to the court, because... Well, it comes back to standard of care. That's what the evidence that's required, the testimony that's required. Because, of course, the defendant can say, I did what I was supposed to do. But the question is, is that the standard of care? Dr. Larkin... That's what I tried to find. Dr. Larkin said, certainly, it is the standard of care for the neurosurgeons on the 11th, who now have Ms. Bau, to get those films from the previous hospital. That is clear in his affidavit. He does say that. Okay. And doesn't that go clearly to your claim, I guess, Swedish Covenant, that they needed, as part of that, under the expert court affidavit, they actually needed the CT scan itself, particularly in this case where they did their own CT scan and didn't see anything. It might have been helpful to... We don't know, because that's a question of fact. Right. Whether it would have been helpful. That's what you're saying? That is what we're saying. And Dr. Larkin says that the standard of care requires those neurosurgeons to get it, so they can compare it. So they can compare it. And a reasonably careful doctor, having received the films from Swedish, would have admitted Ms. Bau on the basis of the subarachnoid hemorrhage that is clearly visible by Dr. Kamal's own admission. Okay. But that deals with the conduct at Boulders and Kellogg at Lutheran General. We're dealing with the dismissal of Kamal of Swedish Covenant. Correct. Now, an analysis that was contradicted three hours or four hours after Kamal's opinion that there was no bleed. And then within four hours, a refusal of the patient to be treated at that location, given presumably the information that was serious, who immediately goes to Lutheran General and is treated by two other professionals. And they did what they did. So the question is, was there a break in the causal chain when Dr. Kim overruled or overread Dr. Kamal, informed the patient of, let's say, a worst-case scenario. The patient denies the opportunity to be admitted at Swedish and goes to another hospital where she's treated by two other doctors who do what they did. And then she unfortunately dies three days later. So the question is, is there a break in the causal chain as it relates to Kamal and Swedish? My response to that is no, there is not. Okay. If I could make one point only today. I want to point out that the admission on the 10th, when she comes in with a new-onset severe headache and she gets a CT scan, it's misread, the decision-making is made on the basis of that read. If that is a separate, self-contained transaction, then anything that happens once she's called back, you can judge the case against Dr. Kamal from the standpoint of causation as follows. What would have happened immediately, according to the record, if Dr. Kamal had identified that bleed? She would have been admitted. Unquestionably, she would have been admitted. That was the opportunity right there to treat what she indisputably had in her brain. She was sent home. She did not refuse any care on the 10th. That is a phrase that is very prejudicial, and it's used a lot by the defendants to characterize what happened here. What happened here is Ms. Bow, when she came back, she was even following the recommendation to come back. She's told by the hospital, by the way, you have a brain bleed in your head. Why don't you come in and we'll treat it? I think she did what any reasonable person would do in that circumstance and said, thank you, no, I'll go somewhere else. But she said she's doing it because her insurance wouldn't cover Swedish. She'd have to go to the Lutheran General. I mean, that's what the evidence says. That is what some people have testified in this case. We can't ask Ms. Bow, obviously. Well, no, but I mean, do you have any contrary evidence to that? That's the evidence before the court. It's a question, do I have evidence that she would have received care? No, that she wanted to stay or she didn't say that. Is there a dispute that she said that? I don't know that there's a dispute that she said that, but I don't think it changes the analysis about what happened on the 10th. Because when she comes back on the 11th, it's a completely different circumstance. All this really happened on the 11th. We're talking about a four-hour gap, right, four or five hours. Give or take. Give or take. It's not 24 hours. But still, the act of sending her home. There's no question. Three o'clock in the morning, she's told she doesn't have a bleed. She goes home. Seven or eight o'clock in the morning, she's called to come on back in. She gets here at nine o'clock in the morning. So at worst, it's six hours, whatever. And told, you've got a bleed. You should be admitted. We want to admit you. She says, according to the record, she says, I'd rather go to Lutheran General. And that may have relevance to some of the claims in this case, such as the claims against Lutheran General for not sending the fellows. Potentially. That may have to be dealt with in this case in front of a jury and those claims that may survive against Swedish or against Lutheran General both. But isn't the question with respect to these two defendants before the court, isn't it that because they didn't do that, the treatment at Lutheran General was inadequate, insufficient? It was certainly impacted. Yes. So tell us why it's because they didn't do that that she wound up, that there is a causal connection between what Swedish didn't do and what Kamau didn't do. Why there wasn't a break in any negligence that they may have committed by Dr. Kim saying, you do have a bleed, you do need treatment, you do need to be admitted. And then she goes away. She goes to Lutheran. And then whatever happens at Lutheran, it seems like it's a different consideration. I don't think the events of Lutheran impact the strict question of what was, what is the causation chain for Dr. Kamau's failure to identify the brain bleed on the temple. Because I think if he finds it, the evidence is clear that she gets admitted right away and she would have been treated. Now with respect to the claims against Swedish for not sending the films. Not sending the films, I think, created a situation at Lutheran where they based their decision-making for Ms. Baum, the decision to send her home, on incomplete information. And our evidence from Dr. Larkins is that if those films were sent to Lutheran as a standard of care required, there would have been a fuller picture. A reasonably careful neurosurgeon like Dr. Bogus, Dr. Kala's physician, would have seen those films and decided we can't send her home despite what our films say because of the risk of a subarachnoid hemorrhage. What was going on in the trial court that caused the trial judge to set the deadline for filing a motion prior to a police investigation? That's a good question. It's one I've asked myself. I can't, I think it was a standard order. It was just a date that the court had set and I don't know how to answer that question, frankly. That concerns me. I wish maybe Tom could answer that question. Okay. The case is still pending, right, against Lutheran General? It is. And, you know, I think there might be a tendency, some people look at this case and say, well, you still have another defendant, or as we look at this case, if there's a problem, it may be with Lutheran General. But we're not here to try that case while they're looking. There's no question about that. When you're looking for some evidence that the outcome would have changed, and specific to Dr. Kamal, I think it's clear. He catches that on the 10th. She gets admitted, she gets treated. Well, he didn't. Correct. Okay, let's assume that that's what the evidence shows. But somebody else did three or four hours or five hours later. Right? Right. That made a big difference. Well, apparently not, because she left the hospital and went to Lutheran General and was found not to have a bleed there. Correctly or incorrectly, but that's what happened. Well, and we say a case in our briefs that says that. Where refusal of care is relevant, as it may be relevant in this case, that's a question of fact for the jury to determine whether perhaps was it reasonable or was it a pure refusal. Because, again, that's a very prejudicial term, and I don't really think that it's a fair characterization of what happened in this case when you have a person who was told, you're fine, go home. Then they call you back and say, you have a potentially life-threatening bleed in your brain. Why don't you come in and we'll treat you? And she says, well, she does go back there. She did, but she didn't know at that time why she was coming back. So if we ruled against you, would the rule in the case become, a rule for future cases, become that once a patient is told you have a situation that needs treatment immediately and we want to admit you, and they decide to immediately go to a different facility for whatever reason, that breaks the causal chain. Would that be a result of our affirming? I would think not in this case and maybe not in any other case, because subsequent malpractice at Lutheran is even foreseeable. So it's foreseeable from Dr. Kamal's perspective if he misses a bleed. There's no relevance, what you're saying. Well, maybe not in any case. No, not in this case. In this case, I think it is foreseeable. I don't think the fact that she says, I don't want to be treated here, that's the chain of causation for the additional reason that what happened at Lutheran General is legally foreseeable, that they might have committed malpractice on her. But even that aside, forget what happened at Lutheran General. What you're saying here is we have enough against Dr. Kamal alone, correct? Certainly. And her going to Lutheran General or not has nothing to do with him. Absolutely. Okay. And then with regard to the Swedish covenant, it's a little different. It's a little different. But the judge felt that the fact that she didn't remain there broke the chain. I think the judge felt, it's certainly correct to the second part, I think the judge also felt that, and this is the problem I have with the order, the judge felt that the decision on the 11th to go to Lutheran when she's called back immunized Dr. Kamal for having missed the bleed. And I frankly, I must keep that in mind. I've been holding it in front of me because I was trying to be polite. Well, that's a sporadic question. But I see a different issue, and I'm not even sure that it's been argued. And the issue that I see is that if this was an emergent condition, it required immediate care and treatment. And she was told, you're fine, go home. She goes home, there's no immediate treatment. She's called back to the hospital and she arrives at 9 o'clock in the morning, several hours later, which treatment could have started already. That seems to be a fact question right there as to whether or not this emergent condition, which did not get immediate care and treatment, that's why she got it. I'm not saying that's why she got it. I'm asking, that could be, but that's a fact question. I don't think it's been argued. I think you kind of ignored it. Well, on the facts of the case, the bleed that Ms. Bowe had on the 10th was likely the product of high blood pressure. It was a hypertensive bleed where Dr. Larkin set out in his affidavit. Well, given that this is the normal review, we can look at that. Sure. Because the record is clear that everybody agreed to this condition that needed immediate care and treatment. And certainly, the sooner she would have received that care, the higher the likelihood that she would have survived the process that ultimately ended her life. Because she had high blood pressure when she came in at Swedish. She received no treatment for it. She had the same high blood pressure at Lutheran General. She got no treatment for that. So it is along a continuum. And it's progressive. And back to my point about the 10th, that was the opportunity. When she's in the hospital, they have her. She hasn't refused any care. She goes there by ambulance. She's there for five, six hours. She had the opportunity at any point along that line to say, hey, I want to go somewhere else. She didn't do that. So to say, using this prejudicial term, she refused care, it doesn't accurately reflect the circumstances on the 10th when she was in their hospital. The fact is, Dr. Kamal missed the bleed. They missed the opportunity to care for her right there. I guess it's unfortunate that we don't get a chance to hear from her. But I know that you mentioned something about she decided to go to Lutheran General because of her insurance. As I was reading through it, I could guess, I'm here at the hospital. I was told to go home because there's nothing wrong with me. They call me back, and now they're saying, oh, there is something wrong with you. It's pretty serious, and we need to start treating you right away. Oh, no, I'm going to go to Northwestern. I'm not fooling with you guys anymore. I'm out of here. So, I mean, the question is, was that reasonable? Yes, I think that's a question of fact in the very least. Maybe I'm unreasonable, but I probably would have cared to go to Northwestern. Right. I took the sermon again. And I think that's another question for the jury. If they're going to try to use the decision against her and say that's a refusal of care that cuts off causation, I think out of the case law that's a question of fact. Look at all the facts and circumstances. What does Dr. Kim's opinion do with respect to potential liability of Swedish covenant? He's acting, I know agency hasn't been decided, but it appears that he must have been in some connection with the Swedish to do an overread, gets her back, and apparently from the record before us, she decides to go to Lutheran General. Now, what more could Swedish do other than send the records that they didn't send, that they were requested to send? What more could Kamal have done? Well, Kamal's out of the picture, by the way. Of course he's out of the picture, but that same hospital and him are back in the picture when he's contradicted in his read of the picture. Right. And two things, Dr. Kim and Dr. Kamal, both in their depositions, they agree there's a subarachnoid hemorrhage on the film. So there's no question about that. It's not, well, maybe Dr. Kim was wrong. No, it's absolutely taken for fact that there is a bleed on that film. Now, again, any question about what could have been done or should have been done by Swedish Covenant, over and above what they did on the 11th, to beat a dead horse, has nothing to do with the causal chain on the 10th. And what the evidence shows reasonably would have happened had Dr. Kim, I'm sorry, Dr. Kamal identified that bleed. Now, you raised the questions with respect to the 11th, when she comes back. But our position is that doesn't have anything to do, certainly does not break the causal chain, for the 10th, which is a self-contained interaction. Why would it be unreasonable to infer that because she refused admission at 9 o'clock in the morning, she would also have refused admission at 3 o'clock in the morning? Because what a difference a day makes, when she's brought back. Now we have a situation where the Hanau has come out of bed at 3 a.m., which she was informed of basically at 8 a.m., and refused admittance to Swedish. Why is it unreasonable to infer that she would have refused admittance at 3 a.m. had Kamal read it properly? Why is it unreasonable to think she would have made the same decision? In fact, to understand the question, I believe that when you're talking about inferences, the inferences have to go on the plaintiff's side, where there's evidence to support them. We have plenty of evidence. You can infer that if she had gotten the right read from Dr. Kamal, she would have been admitted to Swedish and received inadequate care there, and she ultimately would have died anyway. That's an inference in your favor, but I don't think it would be reasonable to make it. The question about what evidence do we have to infer that she would have stayed at Swedish, that's the question. There's plenty of evidence. She was taken there, she stayed there. How did she get to Swedish? By ambulance. It was the closest hospital. It was the closest hospital, but still in all, she was free at any time along that line to, if she did not want to receive treatment at Swedish, if that was her motivating thought process, as the defense likes to say, she could have done that at any point along the line. Right. She received all of the care that was recommended at Swedish. She was a compliant patient. She was there about five hours. She was there about five hours. She would be discharged. And she didn't leave until they told her to go home. So when you ask the question about what evidence is there from which we can infer she would have stayed at Swedish, I think the course of conduct for the five to six hours she was at Swedish is more than enough evidence to create an inference as must be drawn in the plaintiff's favor here that she would have submitted herself to treatment had Dr. Kamal identified that briefly. So your claim against Dr. Kamal and the doctors at Lutheran General is basically had they read the reports and pictures correctly, she would have been properly treated at both institutions. Either one. If Dr. Kellogg and Mayo read it properly, she would have been treated at Lutheran General for blood pressure and she would not have suffered the other bleed that ultimately killed her three, four days later. Right. No, I mean, that's your theory. True. That's the Lutheran General practice. Obviously, she never would have left Swedish. And it's the same theory you have for Dr. Kamal. Had he read it properly, she would have been admitted, she would have gotten the proper treatment, presumably the same type of treatment she could have gotten at Lutheran General and she wouldn't have died three or four days later. Correct. That's the theory. Yeah, and I think the record supports that. And I think one other piece is that when I say what a difference a day makes, one of the things I mean by that is if Dr. Kamal identifies the bleed, she is managed absolutely, wherever she is from that point forward, as a patient with a confirmed brain bleed. Now, the whole situation up at Lutheran General, because they didn't have the scans, I think it's a question of fact as to whether those doctors really believed that she had a brain bleed or not. And I think the jury has to decide that and weigh it for themselves, because on one hand, as we outlined in our brief, Dr. Paulus and Dr. Kellogg from Lutheran General say, in a general patient with a confirmed brain bleed on a head CT and high blood pressure, that patient gets admitted to an ICU for intensive management, monitoring, and workup. But in this case, if you ask him to accept that she has a brain bleed, he says, I wouldn't have done anything differently. And I think there's a basic inconsistency there, and I think that's one of the reasons that that issue has to be decided by a jury, because that comes down largely to credibility, and you can't diverse out the fact that Dr. Paulus and Dr. Kellogg are testifying in this case from the standpoint of descendants who are being held liable for this. So their testimony and the credibility of it, it has to be weighed by a jury, and I don't think that's appropriate for the trial court to do that. I think we've covered a lot of the ground. I think, just to reiterate, I think that the straightforward causation case on the 10th is that if the bleed's identified, she gets admitted, she gets treated, and we avoid all of the morass of what happened on the 11th and all of these questions about who could have done what, who knew what, who didn't know what. They would have known she had a bleed. They would have admitted her. They would have treated her. Everything else would have been avoided. With respect to the 11th, I think you have to take the competing testimony of Dr. Larkins and the doctors at Lutheran as to what they would have done with the undisclosed images. Look at that as a question of fact under the case law. And for those reasons, we would ask for this panel to reverse the sum of judgment order of the trial court. Thank you. Thank you. Mr. Clancy, before we get started, can you just answer the question, what was going on in the trial court that the final motion had to be argued prior to taking the expert deposition? Molly knows that that was part of the case management order. That's not pursuant to any Illinois Supreme Court rule. That was just this judge's case management order that set a deadline for dispositive motions prior to engaging in expert discovery. This is extra record, but it's not terribly uncommon. There are other judges there who do set dispositive motion deadlines much further back than the 45-day deadline in the rules. But as for why, I don't know. Is there anything in the record that shows that any party is objective to that procedure? No. Is it a standing order, or is it an order that specifically grants you participation? That I don't know. But I do know that there's nothing in the record indicating that any party asked for a continuance or asked to, you know, file a Rule 191 affidavit to ask for additional discovery prior to responding to the dispositive motions. I don't even know how that's possible, then. You can't even, you can't, the proximate cause, even though it is a fact and legal question, kind of a combined question, you can't show the proximate cause without an extra claim. So how do you bypass expert definition and decide the issue of proximate cause? It doesn't even make sense to me. Let me see if I can make sense of it. In this case, it wasn't an issue of bypassing expert discovery. It was an issue that proximate cause could be discovered and could be decided and should be decided before we even get to Dr. Larkin's affidavit, for example. And the reason is this, because this case is not Buck v. Charletta. And the plaintiff's linchpin, his springboard to using the affidavit of Dr. Larkin's, is the decision in Buck v. Charletta, which in turn mentions Nelson v. Cam, where the court says, well, if there's missing information, you don't have to accept the doctor's testimony as to what he would have done had he had that information, he or she. You can get an expert to say a reasonably well-qualified doctor would have done or should have done X, Y, or Z. That's the plaintiff's theory in this case, and it fails for this reason. There is no missing information anywhere. When Ms. Bow goes to Lutheran General Hospital, everybody at Lutheran General testifies unequivocally that they have all of the information about everything that happened at Swedish. For them to perceive. For them to perceive, and that they would do the work that they did, exactly as they did, regardless of anything that the plaintiff has to say. But isn't this within the standard of care testimony? I don't. I mean, even though they say all that, I mean, still that doesn't answer what the standard of care is, which is where we started with questioning. So there's nothing here to indicate that the standard of care, for example, required the Swedish government to answer your question, Justice Pierce. It required the Swedish government to transmit or to give the CT images to Ms. Bow as she left the hospital. Dr. Larkin's affidavit doesn't say that. Well, that was actually my question, and I asked that question. It wasn't the plaintiff's question, it was mine. And the reason I asked that question is because I don't recall ever taking my kids in and not getting a copy of the CD with the CT scan or whatever it is, and that's not the issue here. The issue is, that's why I'm asking the question, what's the standard of care? Because my personal experience is not the standard of care. The standard of care has to come in as evidence from some doctor, and it can't only come from an expert because we're talking about proximate cause. It can't come from a lame person in a medical malpractice case. That's true. I would say two things to that. First, Dr. Larkin's does not say that the standard of care required Swedish to give Ms. Bow the images. Second, I would point out the fact that Dr. Boulders at Lutheran General said about 50% of the time when patients come with reported brain bleeds, they come without the images. That suggests, if it's negligence, Dr. Boulders is saying, how about 50% of the time doctors in the community are committing negligence? No, but they can still ask the hospital for it. They did ask the hospital for it, but it wasn't sent by the hospital. They did not ask the hospital for the images. They asked the hospital for the ED records. Right. That's why when that includes, it includes the report on the images. The hospital does not include the images themselves. And they didn't send the images for whatever reason. They didn't send them. But they asked. You would expect. I mean, that's a different issue. I think we can put this issue to bed, even if the standard of care required Swedish Covenant to give Ms. Bow the images or transmit the images with the report pursuant to Dr. O'Garrick's request, as you mentioned. This case fails on proximate cause, because the absence of those images at Lutheran General had no impact whatsoever on the workup that the neurosurgeons did while Ms. Bow was there. It had no impact whatsoever. Do you believe that puts the case to bed? That puts the case to bed. So you're ignoring the issue that I raised earlier as to whether or not the brain belief that was misdiagnosed and then once it was properly diagnosed, that that could be the brain belief that killed her. We don't know. That's a question that would be probably decided at trial. I apologize. I don't know how you're able to put the case to bed. Do you ignore that? And we haven't done a whole review here. So you ignore that. That's okay, because you don't need Swedish Covenant Hospital. Let me address that. I'm going to scope it too broadly. I apologize. It puts the case to bed with regard to the issue of the images versus the report. What we have with Dr. Kamal and his initial reading of the CT scan is it certainly had absolutely no impact on anything anybody did at Lutheran General. There's no evidence that any doctor there testified that they were in any way influenced by the fact that Dr. Kamal initially read the CT as negative. So what does that leave us with? That leaves us with what would have happened if there had been a positive read initially? And this is something that Hunter had mentioned earlier, but we got going on interesting questions. So we really need to put to rest the idea that there is a July 10th timeframe and there is a July 11th timeframe. There is only a July 11th timeframe. Dr. Kamal reads the CT from a distance, tele-radiology, at just before midnight on July 10th. Ms. Bow is still being evaluated. There's a lumbar puncture that's after that. She's not discharged until the earliest of 4 a.m., and she's back the latest by 10 a.m. We're talking about a six-hour gap. When she's discharged at 4 a.m., there's no injury. She isn't injured there. Dr. Larkins, the expert that they rely on, says multiple times in his affidavit, treatment on July 11th at Swedish Covenant would have prevented her injury. Treatment later in the day on July 11th at Luther in general equally would have prevented her injury. There is nothing in the record indicating that her chance of recovery was higher if she was treated earlier. There's nothing in the record indicating that anything expired in terms of her hopes or her potential for treatment. Everybody agrees that immediate care and treatment must be required. Everybody agrees that. Let me clarify as to what everybody actually agrees to. Everybody actually agrees that evaluation and further workup is required. Nobody in this case ever testified that Ms. Bow would have been admitted to the ICU for affirmative treatment of a brain bleed unless and until a neurosurgeon evaluated the case and said that was the appropriate course. Everybody has testified to that. Dr. Bafalakis testified to that. In his deposition, he says he plays no part as an ED doctor in deciding whether somebody is admitted to the ICU. He said that's up to the neurosurgeons. Dr. O'Donnell said that as well. Dr. O'Donnell was actually confronted with a hypothetical. What if there's evidence of a brain bleed, and what if the neurosurgeon says she needs to be admitted? He said, well, then she would be admitted. So that's what everybody agrees to. Everybody agrees to admission and treatment for a brain bleed once the neurosurgeons confirm it and decide that that's the appropriate course. She would have been admitted. I'm not quite sure. Dr. Watkins says that Dr. Kamal Stelter identified a brain bleed on July 10. How did Ms. Bowe, has it led to her discharge instead of admission and treatment of her underlying hypertension? Your response to that, is that true? My response to that is that in Illinois, we do not allow involuntary admissions for medical reasons. What do you mean involuntary? The hospital did not have the right to restrain Ms. Bowe. She wasn't given the opportunity because the hospital never offered it to her because they sent her home. That's the problem. They sent her home. If this had been done correctly, she would never have been sent home. That's what everybody says. We're looking at this and we're talking about it from the hospital. The hospital wouldn't have sent her home. The hospital would have admitted her. The question is, what would she have done? The question is what the hospital said because she goes to the hospital not because she's in charge. The doctor tells her what to do. When the doctor tells me I'm fine, I go home. They didn't say stay. They didn't say follow up. They didn't say anything. They said, it looks okay. That was wrong. And she went home. Any one of us would have done the same thing. But when a hospital says to you, if you don't stay here, we've got to treat this. This is an emergency situation. And if you go home, bad things could happen. And you go home, it's on you. But she never had that opportunity. Your Honor, she did. She had that exact same opportunity. She did not because they told her there was nothing wrong with her. She had that exact same opportunity. We don't have to imagine. This is not a case of, what do we think would have happened? We know what would have happened. But you said, okay, in terms of what she would have done, is that what you're saying? Answer my question, please. Is that what you're saying? Okay. So, shouldn't the jury decide that? No. The jury shouldn't decide that because it doesn't. That's a fat question to me. But it's not a fat question if the proximate cause cannot be decided based on something that's contingent, speculative, or merely possible. Well, you're complaining for Vince right now because now you're switching over to proximate cause. I've been on proximate cause the whole day. You're talking about what she would have done. That's a real clear, fat question, what she would have done. The jury can decide that. It's not speculative to me because she's dead now, but that's a jury question. What she would have done. Would she have done the same thing that she ultimately did at 10 o'clock in the morning? And I've already given you my example of what I think is reasonable under the circumstances. The doctor already told me there's nothing wrong with me. Now, they call me back at 10 o'clock in the morning. They tell me that I have severe brain bleeding that requires immediate care. I probably would have gone to another hospital. Let me ask you something, Mr. McKenzie. This summary judgment was granted because the motion judge felt that the causal connection was broken when Kim called her back and she decided to go to W3. My question is, can a decision be made, which is a legitimate basis for dismissing a defendant, can that decision be made if the decision on what the approximate cause of the injury was in the first place? Because I don't think here anybody's really litigated what the approximate cause of the injury was. Am I right or wrong? No, we did not get into the issue of what actually caused the brain bleed that ultimately led to her death. Right. We do know that it occurred in a different area of the brain. Right. But nobody's established that there was a causal relationship between A, B, C, D, E in this case. Dr. Larkins, admittedly, Dr. Larkins postulates that it was the underlying condition that led to her bleed, her first bleed comparably led to her second bleed, the fatal bleed. And the defendants had an opportunity to present expert testimony with respect to refuting that opinion? No. So if, I assume, there would be expert testimony refuting that, I would assume, right? Unless it's conceded that it was. Then there would be an opportunity to determine whether, what the approximate cause of pain were, and whether there was any break in that causal relationship. I see. See what I'm saying? Yes. Let me just add. It seems to me that we might be in a situation where we have a premature determination of a break of the causal link when we don't know what the causal link opinions are. I think I can address that. Okay. And the reason is because Dr. Larkins states in his affidavit what the timeframe is when she needs care and treatment for this bleed. And he testifies that treatment at Swedish, the evening of the 10th, the morning of the 4th, or at Lutheran General, any time throughout the day at Lutheran General, all that timeframe, that would have prevented the injury that led to her death. So I don't think that we need to go down that road at this stage. I think that it is enough, as the circuit court found, that Ms. Bower's decision to seek treatment elsewhere broke the causal chain and treatment, the treatment would have, Dr. Larkins, that's the plaintiff, that's not me, said that the treatment would have prevented the injury. So the very treatment that their expert says would have prevented the injury is treatment that Ms. Bower declined. And if I could go back to this issue. Let me follow up on your question. Okay. I didn't want to interrupt because I wanted that dialogue to continue. I was loving it so much. But you just stated that Dr. Larkins testified that the first brain bleed caused the second brain bleed. Well, that's what I thought I heard you say. Not only you didn't say that, I'll go back and listen to the tape, but I'm pretty sure that that's what I already said. Not exactly. The first one caused the second one. No, no. That was what led to the second one. Not exactly. You didn't say any of that. I didn't say any of that. Let me see if this helps. What Dr. Larkins says is that the process that led to the first bleed is the same process. The other thing is what's really in the record. That's really what's important is what's stated in the record. I think they're the same. Okay. The process that led to the first brain bleed is what he says is the process that led to the second bleed. If that clarifies anything. Does that clarify it because that's not what you stated earlier? I apologize if I didn't. Because if the first bleed led to the second bleed, the first bleed was not treated. Yes. If I said that justice, I apologize, I didn't mean to, that's not what the record shows. Just tell me, maybe I'm confused, but Dr. Larkins, as David says, not exactly these words, but paraphrases, the July 10th, 11th bleed and the bleed which killed Ms. Bowe were caused by the same underlying condition, hypertension. Had Ms. Bowe been treated for this condition on July 10th or July 11th, she would not have suffered the subsequent fatal hemorrhage on July 14th. The failure of physicians at Swedish Covenant Hospital and the African Lutheran Hospital to properly diagnose Ms. Bowe's brain bleed and treat this underlying was a proximal cause for death. That's what he says. That's what he says. So you're not saying anything different than that? I'm not saying anything different than that. I'm saying the underlying process, this led to one, it also led to another. It wasn't this bleed that led to that bleed. So if I did say that, please allow me to clarify. I would like to go back to the issue of whether it's a question of fact whether Ms. Bowe stayed and received treatment for something as serious as a brain bleed at Swedish Covenant when we know, you asked Justice Hyman, but what if she was told this is serious, you have a brain bleed, you have to be treated. She was told that. Dr. Vasilakis told her that on the morning of July 11th, and she still said, I want to go to Swedish Covenant, or I want to go to Lutheran General. I apologize. And the reason she wanted to go to Lutheran General, again, we don't have to guess. We don't have to, I think somebody mentioned, well, we can't ask her what her reasons were. We don't have to ask her. The record reflects what she said. She emailed her primary care physician, Dr. Weiner, and said she's going to Lutheran General because of her insurance. Her significant other said she's going to Lutheran General because that's where she's gone for all of her treatment that I know of. I've never known her to go to Swedish Covenant for anything. And her primary care doctor is at Lutheran General. She wasn't brought voluntarily to Swedish Covenant. She didn't accept transit to Swedish Covenant. She was brought there by ambulance who took her there because it was the closest. Her significant other testified that had she been given the chance or choice of where to go, she believes she would have picked Lutheran General. Now, she was there for a number of hours, mostly waiting for the result of tests. But when the rubber met the road and she found out that she had something serious, she chose Lutheran General, not Swedish Covenant. And she didn't choose Lutheran General. She didn't walk away from Swedish Covenant because of any lost confidence in Swedish Covenant. There's no evidence of that. Before there's a question of fact that gets to the jury, we have to ask ourselves, is there evidence in the record to justify giving this question to the jury? There is nothing in this record that would indicate or support, even in inference, that Ms. Barlow stated Swedish Covenant for treatment of something so serious as a brain bleed when we know she didn't when it was offered and we know why she didn't and the whys wouldn't have changed whether it was 4 a.m. or 10 a.m. What about the issue of transmitting the records to Lutheran General? Again, Dr. Borges and Dr. Kellogg both testified that they knew there was a brain bleed. They knew that the CT records showed a brain bleed. Well, the question is, apparently they got a number of records. It's a failure to get the actual pictures, the images. Is that appropriate or inappropriate? You probably don't want the lowest answer, but what I'd like to say is it doesn't matter if it's appropriate or inappropriate because it didn't make a difference. The images and the report are not two different pieces of information. They are two different methods of conveying a piece of information, and the information being conveyed is that there's a severe acumenoid bleed in the frontal lobes. I think that's incorrect because under that theory, then nobody would ever want to look at an actual scan. All you need to do is look at what somebody's written, and that's not true because then you don't need Dr. Lee or Dr. Kim to look at the original. The fact that Dr. Kim saw this, and what he saw, and it seems to me it's very important. It's not what they write out. That's an opinion. Effect is the film itself. The opinion is what the doctor writes. The first doctor wrote an opinion saying there's nothing wrong with it. The second doctor writes an opinion, there's something wrong here. And these two doctors at Lutheran were aware of the second opinion. They're aware of the second opinion. And the first. And the first, and what they testified to was, well, first of all, they testified we always repeat the scan. Dr. Gold was testified seven times that even when the patient walks in with the images in her hand, we repeat the scan on our equipment to be read by our radiologists. Then they both testified, Dr. Forbes and Kellogg, that if there is a bleed on the scan, the next thing we do every time, the only next thing we do is a CT angiogram. And they did that. Now, there was no bleed on a Lutheran general CT, but they did a CT angiogram anyway. Why? Because they're treating this bowel as if she had a bleed. I believe this is a false choice between the question of the image versus the report, because they're saying if I looked at the image and the image shows a bleed, Dr. Kellogg was asked, if you assume that image shows a bleed, what do you do? We do a CT angiogram to look to see if there are any treatable underlying causes for the bleeding. And they did that in this case. They gave missed bowels and woke up that they would have given even if there was no dispute in the world that was a bleed. But that's still different because things can happen to one's brain over the course of hours, and the fact that the Lutheran general CT scan did not see what was originally seen by Dr. Kim indicates that. So, again, it would be important for, it seems to me, even if they do this again, and they're going to double-check on their own equipment with their own doctors, you wouldn't ask for the other information unless you want the whole information. And they give them half the information they got. And it's a critical piece of information because it was read differently by CT. I believe that it's- But we don't know. And the only way to know is to have some expertise. And to me, that goes as data. I believe that it's not two pieces of information. I believe that it's one piece of information that she had a bleed, and that they treated her as if she had a bleed, and- Well, okay. I mean, but you're saying that you're playing up to them. I'm saying that nothing would have been different in Ms. Fowler's workup, whether they had the images or not. Well, we don't want that. I'm not saying that, but they're saying that. Who's that? Dr. Valdis and Dr. Kellogg. Who are different? So, you know, you've got to take what they say with that knowledge. And it seems to me that the jury may or may not believe them. Well, there's no particular reason for Dr. Valdis and Dr. Kellogg to have said that Dr. Kamal is Swedish. What about the transmission? Did the Swedish have a duty to transmit the pictures, the entire records, the entire files? Did they have a duty to do that? I don't believe so. Well, the plaintiff never argued that they had a duty to do so. The plaintiff never presented any argument or evidence from Dr. Valdis that they had the duty to do so. And that's, to your understanding, the basis for their claim of likeability for Swedish, in addition to perhaps agency? The plaintiff's claim against the Swedish government is based on apparent agency. One, that Dr. Kamal's initial read somehow muddied the waters at Lutheran General. It did not. And two, that the failure to give the images in this bottle somehow led to a different result at Lutheran General. Again, it did not. Did Larkins say it did, in his opinion? Larkins said that a reasonably well-qualified physician with the images would have treated her. But did he say that it was a breach of the standard of care for a hospital Swedish not to transmit the images? No. The only thing he said was that the standard of care required Lutheran General, the receiving hospital, to obtain the images. He didn't refer to Swedish government. So, Judge Sheehan's ruling dismissing Swedish from the case was really based on a break in the causal chain. It wasn't on the issue of breach of the standard of care for a medical institution to do or not do something. Right. So, that's sort of an important issue in the case, isn't it? I mean, decided, not decided, but disposing of a defendant. It just seems, here's where I come down on this. It reads like this stuff happened too soon. We're not finished with the case. You guys are not complete in your discovery. And my volunteer admonishment to everybody is if you get a standing order from any motion judge or any judge that doesn't assist you in presenting your case competently and fairly and thoroughly, you have to put on the record that, Judge, we want a hearing. We're not ready. We can't do this. Make a record. I mean, if the judge insists on doing what they want to do, you have to have a record to come to court and say, this shouldn't have happened because we weren't finished. If that's the case. But you just should not sit idly by while a judge submits an order and makes you do things that just don't fit with the reasonable handling of a lawsuit. With that, I appreciate that observation message received. It's not to you. It's to everybody. But what I would say, to wrap it up, is there are other issues in the case. Is the duty an issue? Is the standard of care an issue? All of those things are issues in the case. But as this court knows, as all courts know, many, many, many times, opinions are issued saying, we don't need to reach issue A because issue B is dispositive. And here what we have is a break in the causal chain. We don't need to go down the standard of care path. We don't need to go down the duty path. We don't need to go down the damage path because there's a dispositive break in the causal chain. Nothing would have been different. And you know what the problem is with that? Because the appellate court can affirm the charge on any basis in the record. But when those bases are not dealt with in the record, it's going to go back. I would ask this court to affirm the decision of the circuit court granting summary judgment in favor of the defendants on the basis of whether it's always adequate to do that. Thank you. Thank you. Counselor, do you wish to? I'd like to hear her question. Go ahead. Thank you, Your Honor. And again, Karen DeGrand on behalf of Dr. Kamal and International Tele-Radiology. And I believe that Mr. Clancy really covered the basis. The Swedish Covenant is alleged to be responsible for Dr. Kamal as well as other issues. But I'd just like to make a few quick points to supplement and perhaps answer any questions that Justice Pierce or either of you may have. I want to reiterate to Justice Walker, we are not ignoring the standard of care. It's really the opposite in the situation where we go before the court in accordance with the ordered deadlines of the court to, if we have a dispositive motion, to raise it before we get to full expert discovery. And the election of plaintiff's counsel was to move forward with Dr. Reckon's affidavit as opposed to an objection to moving forward. So that's the procedural posture that we were living with. But there certainly isn't, I wouldn't want the court to feel that there's a disregard for the standard of care by the defendants, rather that this is really just concentrating on proximate cause. And I feel that the record, and there's been a lot of interesting discussion today, but the record is very clear as to Dr. Kamal. Because the distinction for what Dr. Larkins is entitled to have his affidavit reviewed and his opinions conserved if they have a basis, if there's a fair, short basis for them. But what Dr. Larkins completely ignored in his affidavit was the sequence of events of July 10th into July 11th, that Ms. Bowe did not actually refuse to be readmitted or to be admitted at Swedish Covenant. And as far as questions that were raised, that the plaintiff's counsel raised during his presentation, there hasn't been any question, there was no question raised before the trial judge about Ms. Bowe having sufficient information. That was not raised, that has not been a question on this record, and I think it's very clear from the testimony of her boyfriend that she had a full understanding of the seriousness of the situation. And so I don't believe that that presents an issue of fact. As far as Dr. Larkins making the conclusion that Dr. Kamal's conduct constitutes a proximate cause, that completely ignores the situation that Ms. Bowe refused any care and... Was refusing any care when? Yes, when she came back. Right, and so it's not the situation, and Justice Walker gave that example, but normally you would expect a person who has this information to very readily go to the hospital, but we've got a different, we've got a unique facial record here, we have a different facial record here, where the person who is making the choice, there's no question about making an informed choice, and the person who's making the choice, there's not anything but speculation that she made a choice to go elsewhere, not Swedish Covenant, but it was based on insurance considerations. We don't know that for sure because she's not here, but we also know that the information she received earlier in the day was incorrect. That's true, that's true. And the jury can hear that and make a decision based upon all that information. But the jury can't draw an inference of causation, Your Honor, that's got to be supported by extra testimony. Right, I don't have that. I'm sorry, Judge, I don't have that. And what we have here is Dr. Larkin saying, he's really saying, he really says the opposite of an inference that, you know, that there's this, the way plaintiff wants to, I think the phrase he used was make, say, this is a separate transaction. It's not a separate transaction. And when this court considers causal cause, it doesn't lock off everything from the conduct. It has to be the conduct and it has to be connected to an injury. By Dr. Larkin's affidavit, there isn't any injury at the time that Ms. Baum was discharged. By his affidavit, it's, you know, she continues to have an issue with blood pressure, and it's not addressed, and then it is, once she has the information that she needs, she's at Lutheran General, or after she has the information she needs, she's at Lutheran General. So there's no injury that occurs in that, you know, the plaintiff calls the July 10th timeline. And there's no proximate cause unless there's an injury. There's no, you have to have all of the elements. So I think that's a false distinction. No, if your argument is correct, then there was no determination or no consideration of what the proximate cause of the injury was. If there was no consideration of that, how can one, as a matter of law, decide that this situation is broken? The causal connection. I'm basing it on Dr. Larkin's affidavit. Well, and if he didn't deal with the proximate cause, how can the trial court say it was broken because of these other events? Because we don't know what the proximate causation was. Right. I understand, Judge, and I understand that this case didn't come to the court with, you know, five experts to pose and so forth. But what we do have here is an uncontested chronology of events that showed that Ms. Bell, when told, you've got this serious problem, and again, no issue on the record of what she was told, but she was told, you've got to go back. Her boyfriend flips her in the car. He says, we're going to swing by Swedish Covenant on the way to Lutheran General. She's at airtime by 1030 in the morning. She sent an email. But you're waiting after what Dr. Larkin talks about because here at C2492, he says, Dr. Camel's failure to identify Ms. Bell's bleed on July 10th was the proximate cause of her death, period. So his failure was the proximate cause of her death, period. So now you're talking about all this stuff later on. This is what he says right there. He offers their conclusion. He also states in this affidavit that the opportunity was there at Lutheran General. There's nothing in his affidavit that leads to the conclusion that there was an injury before the time of death. So there's nothing in the record to conclude. The proximate cause of death is what he says. Right. So what more does he need to say there? It's contradicted, and frankly, I think rebutted by his statement, that the treatment that Ms. Bell could have had, that he says could have had and could have resolved her problem, blood pressure treatment, also was available to her at the time she was at Lutheran General. So there's no injury, according to him. So what's wrong with him having different – if you believe that to be different, is there anything wrong with having slightly different theories? But he can't change the facts. Is he changing the facts? I think he does change the facts when he ignores all of the – when he basically speculates that she would have stayed at Swedish Covenant. When? Stayed at Swedish Covenant when? When? In the morning, at 4 o'clock in the morning? Yes. She would have stayed at 4 o'clock in the morning when they told her to go home. That's speculation in my opinion, Your Honor. I think that's speculation. How can you say that's speculation? You go to a doctor, you go to a hospital, and they say, go home, and you go home. Where's the speculation? And I misspoke. I think it's speculation to conclude that if she had been told at that time to stay, that she would have stayed. Because we know that when she was told to be admitted, however many hours in, 4 or 5 hours later, that she refused. Well, one doesn't have necessarily to do with the other, and a jury could find that they are separate, and that the information she knew later on did have an effect upon her at that time, while the earlier date, early in the morning, she's told to go home. Now, I don't know how many people would say, please, please, put me in the hospital because you just don't want to go home. I won't go home. No, no, no. I'm not saying there's speculation there. No. But I am saying that what we do know about her and what we know about her position about needing to be treated at Lutheran General means that the treatment would have occurred at Lutheran General. We don't know that at all. In fact, what's opposite of that is the fact that the ambulance took her to a Swedish government. So, she would have done that maybe. We don't know. And so, to me, it's something that a jury needs to do. It's the domain of a fact question. I mean, there's different points of view on it. So, I will agree with that. And I think on the record and on these unique facts that there is no fact question on that issue. What part does the fact that Dr. Kim came up with a contrary opinion of the CT scan, within three or four hours of Dr. Kamal's opposite opinion, what does that do to this whole issue of causation? Did anybody say it doesn't matter? She should have been diagnosed at 3 o'clock in the morning, 1 o'clock in the morning, whatever it was. Yes, and Dr. Lutheran doesn't say that. Well, that's the question. It seems to me that the plaintiff is saying, but for Kamal's error, assuming it's an error, she would not have died four days later because she would have gotten treated. But for Lutheran General's errors and those doctors, she wouldn't have died four days later. Does the fact that Dr. Kim interprets the, does an over-read, finds, concludes there's a bleed, does that do anything to the but-for analysis? I think it supports the defense on the but-for analysis because his analysis is, here's my view to this, I think there's a serious issue, emergency room department, get in touch with Ms. O. Does that break the causal connection between Dr. Kamal and the ultimate causation? I agree, I think that's an important question. I'm not saying it does. I'm asking you to tell me why it does. Because at that point in time, there's no contrary testimony in Dr. Lutheran's affidavit. At that point in time, they're one step closer to a diagnosis and treatment. And then, of course, I recognize that there's questions about this, but at that point in time, the call is made and the patient determines that she's determined to- So would that be a fact question for a jury to decide, let's assume there was malpractice and failure to read the CT appropriately by Dr. Kamal. Three or four hours later, Dr. Kim does a contrary reading and we know that she goes somewhere else. Is that a fact question for a jury to decide whether Kamal's negligence contributed, caused or contributed to her ultimate demise? I don't think that's a question of fact, and I don't think that supports the judgment of the trial court. Can you briefly- Because, again, not isolating this into- You have two contrary opinions. Right. Kamal and Kim. Correct. And the patient goes elsewhere. Right. Let's assume she didn't go to Lutheran General because it's the same result, right? She expires or passes out four days later. Does Kim's positive analysis break the causal connection of the misreading of the CT scan contributing to her ultimate death four days later because of another aneurysm or whatever? I think the way I view the judge is-I'm sorry. Judge is fine. But I think the way I view that is being yet one of the facts of this case that establishes that there's no cause in fact. What gets back to my original-not my original, but one of my comments today, if the court really didn't or the parties didn't bring to the fore the issue of proximate cause, how can a court decide that there's a break in the causal chain if we don't know what the proximate cause was? It seems to me, Your Honor, that there is enough evidence here of the course of events without determining the specific medicine. And I think there is some agreement between the doctors specifying, the defendants specifying, or rather not the defendants, the autopsy report results and Dr. Larkin's concession that the bleed was in a separate part of the brain. I don't think that that specific point has to be resolved in order to support the court's ruling on the motion for summary judgment. I think that the cause in fact still is simply not there for the plaintiff that it would require speculation to reset- Well, the cause is not the proximate cause because they're not the same and you think they're going to be interchangable. The issue right now, because the issue is the trial court will decide whether or not there's a cause. The proximate cause. Right. The issue of cause in fact is pretty much always decided by a jury. In fact, by a jury. So proximate cause being a legal cause deals with issues of foreseeability, revocations of time and space, and those issues the trial judge could decide if there's been a medical contact with the patient. There's an expert testimony that the plaintiff cannot show proximate cause and therefore decides a case of motion for summary judgment. In this case, there's conflicting testimony as to whether or not the doctor, Kamal, your client, is the proximate cause of the injury, whether or not his negligence is the proximate cause. And that issue could still be decided by a jury if we were to take that. Ultimately, the jury has to decide cause in fact and proximate cause and the evidence. So to the extent that you're arguing the issue of proximate cause, there's evidence in the record. The plaintiff has evidence in the record to show proximate cause. The testimony, the affidavit of Dr. Larkin. So the trial court found that there was no evidence of proximate cause and therefore the case should be decided on summary judgment. Your Honor, one point I would like to make is that our position isn't simply that there's, you know, we're talking about both elements of proximate cause, cause in fact and legal cause. And on the defense side, we've argued that both are different things. They are two different things. But we argue that plaintiff's case fails on both counts. Thank you very much for your time, Your Honor. Thank you. Briefly. Thank you, Justices. Just a couple points I'd like to reiterate. Refusal of care from the defense side as cited in our brief. In cases where refusal of care is a relevant consideration, whether the treatment was offered and refused is a question of fact. And that's Newell v. Cortez, 125 O.F. 3rd, 1087 and 1094. It's in the brief. Yes. And so the significance of that is the defendant seems to be saying, we know with absolute certainty that she would have refused care had it been offered on the 10th. Had Dr. Kamal identified the brain wound, which he did not identify. That's a question of fact. And they have an affirmative defense on that as well. I think they're working on proving that. And that's something that has to be resolved by the jury. And just to reiterate, and I know it's come up before, but it's important to my case, Ms. Biles stayed at Swedish Covenant for five to six hours that she was taken there. She could have chosen if she had such strong feelings that she would never have consented to be treated there. She could have left at any time and she didn't. That is evidence, certainly direct evidence, but at least the inference favors Ms. Biles that she would have. And it's enough for a jury to decide. Thank you very much. Thank you. We appreciate the arguments, given you as much time as you wanted. And I think we did so because we find this issue very enlightening and important. And your briefs are very good, and so are your arguments. They've given us a lot of things to think about. We'll take that in your advisement. We're going to have a stand adjourned before the next case. Thank you.